### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

David Keane,

       Plaintiff,

    v.

Expeditors International of
Washington, Inc. and
Expeditors Hong Kong Limited,

      Defendants.

No. 24-10399

### COMPLAINT AND DEMAND FOR JURY TRIAL

### INTRODUCTION

1.    This case arises from the Defendants' unlawful employment actions that discriminatorily targeted the Plaintiff based on his gender and national origin. As further described below, the Plaintiff asserts that the Defendants terminated his employment in violation of Title VII of the Civil Rights Act without cause after over 25 years of exemplary service and growing an account from one that generated 12 million dollars per year in sales for the Defendants to one that made them 60 million dollars per year in profit.

2.    A central aspect of the Plaintiff's claim is that the Defendants devised and implemented a covert program designed to clandestinely reduce headcount without resorting to layoffs. Through this scheme, spelled out in an internal email, the Defendants terminated employees by claiming supposed "performance deficiencies" while strategically pressuring resignations. However, these stated performance reasons were merely pretextual justifications to cloak the Defendants' true aim of clandestinely cutting over 2,000 positions in violation of the company's explicit no-layoff policy and workers' legitimate expectations of continued employment.

3.    The Plaintiff alleges that this secret program dismantled critical safeguards intended to prevent discriminatory practices and protect due process. With undue pressure placed on managers to cut staff without regard for procedures, the secret program incentivized the elimination of positions in a manner that permitted race, sex and national origin discrimination.

4.      The Plaintiff alleges that the Defendants targeted him for termination based on his sex and national origin, employing a sham investigation and disciplinary proceedings rife with gender bias and lacking in the most basic due process protections. Through summoning past discredited allegations and denying the Plaintiff a fair defense, the Defendants orchestrated the Plaintiff's summary dismissal in contravention of anti-discrimination laws.

5.      In terminating Plaintiff David Keane's 25-year career with discrimination based on his sex and national origin, in breach of contractual obligations and without cause, Defendants have inflicted substantial economic and non-economic damages on Plaintiff. Through this action, Plaintiff seeks relief under Title VII of the Civil Rights Act of 1964, for breach of contract, negligent infliction of emotional distress, and interference with prospective business relations, for the harms caused by the Defendants' discriminatory, unlawful, and tortious conduct. This includes back pay, front pay, damages for emotional distress, punitive damages, disgorgement

of profits unjustly derived from Plaintiff's
development of a customer account, which generated
approximately $60 million in annual profits for
Defendants at the time of his termination, and
other appropriate remedies to make Plaintiff whole
and prevent such injustice in the future.

## JURISDICTION AND VENUE

6.      This Court has federal question jurisdiction over
the subject matter of this action pursuant to 28
U.S.C. § 1331 because it arises under the laws of
the United States, and over the state law claims
pursuant to 28 U.S.C. § 1332 because the matter in
controversy exceeds the sum or value of $75,000,
exclusive of interest and costs, and is between
citizens of different states.

7.      Supplemental jurisdiction also exists for the non-
federal question jurisdiction claims pursuant to
28 U.S.C. § 1367 because they are so related to the
federal question claims that they form part of the
same case or controversy.

8.     Pursuant to 28 U.S.C. § 1391(b), venue is appropriate in this district as a substantial portion of the events or omissions that form the basis of the claim occurred herein. Additionally, in accordance with 42 U.S.C. § 2000e-5(f)(3), venue is further justified as records pertinent to the alleged unlawful employment practices are maintained and administered within the State of Massachusetts and unlawful employment practices occurred within its borders. Moreover, but for the said alleged unlawful employment practices, the Plaintiff would have been employed in this district, thereby establishing a significant connection to this forum for the purposes of adjudicating the present claims.

**PARTIES**

9.     The Plaintiff, David Keane, is a Massachusetts resident residing in Sagamore Beach, Massachusetts and is a citizen of the United States of America.

10.    The 1st Defendant, Expeditors International of Washington, Inc. (**"Expeditors"**), is a corporation organized under the laws of the State of Washington and having a principal place of business of 1015

Third Avenue, Seattle, Washington. Expeditors conducts business throughout the United States, including within Massachusetts, and internationally.

11.    Expeditors has been and continues to be a globally recognized provider of comprehensive logistics services.

12.    Expeditors offers a wide array of services, including but not limited to air and ocean freight forwarding, vendor consolidation, cargo insurance, distribution, and an extensive suite of value-added logistics solutions designed to meet the complex demands of global trade.

13.    As a testament to its standing in the industry, Expeditors is not only publicly traded on the New York Stock Exchange under the ticker symbol "EXPD", but also a distinguished Fortune 500 company, reflecting its significant market share and influence in the logistics sector.

14.    Expeditors is legally accountable for the actions and inactions of its personnel, specifically those executed, verified, enacted, and authorized within

their official capacities.

15.     The 2nd Defendant, Expeditors Hong Kong Limited
        (**"Expeditors HK"**) is a foreign corporation
        organized under the laws of the Hong Kong Special
        Administrative Region of the People's Republic of
        China and having a principal place of business of
        36/F-37/F, Enterprise Square Three, 39 Wang Chiu
        Road, Kowloon Bay, Kowloon, Hong Kong.

16.     Expeditors HK is legally accountable for the
        actions and inactions of its personnel,
        specifically those executed, verified, enacted, and
        authorized within their official capacities.

17.     Expeditors HK, a wholly owned subsidiary of
        Expeditors, operates not as a separate and distinct
        entity but as an integrated and indivisible
        operational arm of Expeditors within the Hong Kong
        market.

18.     Expeditors HK shares common management with
        Expeditors and the CEO of Expeditors is a director
        of Expeditors HK. Additionally, Expeditors HK's
        management structure is so intertwined with
        Expeditors that they effectively operate as a

7

single entity.

19.    The relationship between Expeditors and Expeditors
       HK is not just a matter of ownership and shared
       management; it is dynamic synergy that extends into
       the    daily    operations    and    crucial    executive
       decision-making.    Expeditors    wields    direct    and
       substantial command over the business activities
       of Expeditors HK, to the extent that the latter
       functions    virtually    as    an    extension    or    mere
       department of Expeditors. In this tightly coupled
       arrangement, significant personnel decisions and
       operational policies are made or are subject to the
       endorsement    by    the    management    and    CEO    of
       Expeditors, yielding very evident symbiosis that
       underscores the absence of corporate separation.

20.    Expeditors HK's adherence to corporate policies is
       not merely a formality but a manifestation of
       Expeditors' pervasive control. Expeditors HK is
       required to implement and follow the Code of
       Business Conduct, personnel policies, and business
       directives    promulgated    by    Expeditors,    which
       directly impact the conduct and activities within
       Hong Kong. Moreover, Expeditors HK's compliance
       with these policies is monitored and enforced by

8

Expeditors, reflecting a relationship that is not only hierarchical but also functionally integrated.

**FACTS**

21.    The Plaintiff's tenure with Expeditors spanned approximately a quarter of a century, having initiated his career with the company in the year 1998.

22.    At the inception of his employment with the company, the Plaintiff was domiciled in Massachusetts, and worked full-time at the Expeditors facility located in Centennial Business Park in Peabody, Massachusetts.

23.    In August of 2012, the Plaintiff was working as a Global Account Manager (**"GAM"**) for Expeditors in Massachusetts.

24.    As a Global Account Manager at Expeditors, the Plaintiff was entrusted with pivotal duties that included nurturing client relationships, spearheading business development, and managing comprehensive account services.

25.     The GAM role required the Plaintiff to act as the
        primary liaison between the company and its
        clients, ensuring the delivery of tailored
        logistics and freight forwarding solutions.

26.     Concurrently, in August 2012, the Plaintiff was
        presented with a strategic career decision by
        Expeditors' senior management: to assume
        responsibility for the account of Lenovo Group
        Limited (**"Lenovo"**), a Chinese multinational
        technology enterprise renowned for its development,
        manufacture, and sale of consumer electronics,
        personal computers, software, business solutions,
        and ancillary services.

27.     Lenovo is frequently depicted by Western media as
        being intricately linked with the Chinese
        government, adding a layer of complexity and
        significance to the account.

28.     Upon assuming control of the Lenovo account in
        2012, the Plaintiff inherited a business segment
        that contributed a paltry $12 million in annual
        sales to Expeditors.

10

29.     Initially, the Plaintiff's strategic oversight was focused on bolstering the Lenovo account's operations between China and the United States. However, the Plaintiff's exceptional management saw the account's scope expand from a bilateral focus to encompass a multitude of global markets.

30.     Faced with the account's unprecedented expansion, Expeditors and Expeditors HK approached the Plaintiff in 2016 and asked him to relocate to Hong Kong to manage the account from there.

31.     Expeditors indicated that if the Plaintiff refused to relocate to Hong Kong, it would transfer the Lenovo account to another manager at Expeditors HK.

32.     The Plaintiff, married and a parent to two children with substantial familial and personal ties to Massachusetts, declined the request to relocate to Hong Kong given the significant disruption it would cause to his life.

33.     Expeditors was unable to secure a suitable replacement, underscoring the Plaintiff's critical and irreplaceable role in managing the account's success and highlighting the unique management

expertise that the Plaintiff possessed.

34.    With the unsuccessful search for a replacement, Expeditors and Expeditors HK altered their approach, coercing the Plaintiff in early 2018 to accept a relocation to Hong Kong, as Expeditors HK wanted him located there, under the threat of employment termination, a move that starkly deviated from the initial nature of the Plaintiff's assignment.

35.    Before the transition in corporate leadership with Mr. Jeffrey Musser's appointment as CEO of Expeditors in early 2014, the Plaintiff had never been subjected to coercive employment practices.

36.    With the change in management, there was a discernible shift in the company's approach. Aggressive tactics, including threats of dismissal despite the Plaintiff's proven track record with the Lenovo account, became increasingly commonplace, marking a significant and concerning departure from previous management practices.

37.     During the negotiations regarding a transfer to Hong Kong, both the Plaintiff and Expeditors reached a mutual oral agreement that the Plaintiff's move would be of a temporary nature until a replacement was found to manage the account, with the Plaintiff resuming his duties at the Massachusetts location following the appointment of a successor.

38.     Additionally, Expeditors agreed that the Plaintiff's employment status would remain with Expeditors, with no transfer of employment to any other entity, underscoring the temporary condition of the Hong Kong assignment.

39.     During the negotiations, the Plaintiff did not consent to designate Hong Kong as the exclusive forum for resolving employment-related disputes.

40.     Based on information and belief, the Defendants' insistence on relocating the Lenovo account management to Hong Kong may have been driven by a strategy to circumvent the substantial tax liabilities associated with operating the account from Massachusetts.

41.     After difficult negotiations, which were conducted while the Plaintiff was located within Massachusetts, the Plaintiff and Expeditors entered into an Employment Agreement, in addition to the above oral agreement, on 10 July 2018.

42.     The relevant terms of the Employment Agreement provided that the Plaintiff's employment would commence on 1 September 2018 and that it was expected he would be stationed in Hong Kong with Expeditors HK upon the commencement of employment.

43.     The Plaintiff signed the Employment Agreement while located in Massachusetts which was presented to him by Expeditors and Expeditors HK in that jurisdiction and but for the coercive tactics of Expeditors and the oral agreement would not have agreed to relocate to Hong Kong on a temporary basis.

44.     From 2012 until his relocation to Hong Kong, the Plaintiff diligently managed the Lenovo account from Massachusetts. The Plaintiff's role, while stationed in this locale, involved sporadic travel

to Raleigh, North Carolina, but the crux of his work—including strategic planning, team collaboration, and critical decision-making—was anchored in Massachusetts. This work entailed comprehensive sales analyses, client engagement, and logistics coordination to meet the account's objectives.

45.    Integral to the Plaintiff's role was the meticulous maintenance of all pertinent records, which were systematically stored and secured at the Massachusetts facility, which at the time had approximately 120 employees.

46.    This record-keeping was not only crucial for the day-to-day management of the Lenovo account but also served as a repository for the history and ongoing narrative of the account's explosive growth under the Plaintiff's stewardship. Additionally, original records related to the Plaintiff's employment with Expeditors were also stored on site.

## Hong Kong

47.     On or around 1 September 2018, the Plaintiff
        initiated his tenure at the Expeditors HK office,
        as per the oral and Employment Agreements.

48.     Expeditors and Expeditors HK paid the Plaintiff's
        expenses    related    to    his    relocation    from
        Massachusetts to Hong Kong.

49.     Subsequent to his relocation, the Plaintiff's
        management of the Lenovo account became centralized
        at    this    Hong    Kong-based    facility,    where    he
        continued to exercise his responsibilities with the
        same level of dedication and expertise as had been
        the case in Massachusetts.

50.     In    Hong    Kong,    the    Plaintiff    sustained    his
        unwavering    commitment    to    the    Lenovo    account,
        applying his extensive knowledge and strategic
        insight to further its development. The Plaintiff's
        efforts    were    met    with    continued    success,    as
        evidenced    by    the    account's    ongoing    growth    and
        profitability during this period.

51.     During his tenure managing the Lenovo account, the
        Plaintiff developed a professional relationship
        with Mr. Gareth Davies, who was serving as the
        Executive Director & Head of Global Logistics for
        Lenovo at that time.

52.     Mr. Davies was a pivotal contact within the
        logistics industry, overseeing an expansive budget
        exceeding one billion U.S. dollars for logistics
        services annually, and his interactions with the
        Plaintiff were instrumental in the continuation and
        expansion of the business relationship between
        Expeditors and Lenovo.

53.     While the Plaintiff did subsequently form a
        personal friendship with Mr. Davies—a commonplace
        occurrence in the industry—their social
        interactions were infrequent, a result of their
        demanding schedules and other professional
        obligations. When opportunities for socialization
        did arise, they typically involved casual and brief
        engagements, such as sharing a meal or enjoying a
        round of drinks at a local pub.

## The False Allegations

54.     Among the team members supporting the Lenovo account was Ms. Edwina Ho. Ms. Ho served as a Regional Account Manager at Expeditors HK, reporting to the same supervisors as the Plaintiff. Ms. Ho had similar job duties and responsibilities to the Plaintiff, as she was also tasked with supporting the Lenovo account by addressing their logistical needs and serving as a liaison between Lenovo and Expeditors HK.

55.     Thus, Ms. Ho was similarly situated to the Plaintiff in all material respects, including job function, level of responsibilities, supervisory structure, performance standards, and conduct expectations.

56.     On 2 September 2019, the Plaintiff received an email from Mr. Davies, who was acting in his official capacity as an employee of Lenovo. Mr. Davies expressed regret in the email's content and referenced an attached letter for the Plaintiff's review.

57.    The document annexed to Mr. Davies' email, dated
       the same day, was a formal Notice to Cease and
       Desist, marking a significant communication in the
       context of the ongoing business relations between
       Lenovo and Expeditors. At the time, the Lenovo
       account was generating approximately **$230M** in sales
       and **$45M** in profit per year for Expeditors and was
       ranked as one of the top accounts globally, as
       compared to the **$12M** in sales it was generating
       when the Plaintiff assumed control of the account.

58.    Mr. Davies, in the pertinent portion of the Notice
       to Cease and Desist, wrote the following:

       It has come to my attention that your associate,
       Ms. Edwina Ho, is alleging that you have been
       falsifying both my engagement and that of my team
       members when submitting expense claims to
       Expeditors Hong Kong.

       These allegations include:

       • That I participate in playing golf with you
       (usually on weekends), and therefore all charges
       incurred by you for this activity are for business
       reasons. You will be aware that I have never
       participated in any such event with you.

       • That you are 'entertaining' me weekly, which
       includes drinks, dinner and further activities
       often lasting until 04:00am or 05:00am, resulting
       in both an expense claim and non-attendance in the
       office the following day. Again, I would state you
       are fully aware that entertaining of this fashion,
       either the level or the frequency of meetings, is

simply untrue. I would additionally add that I have no knowledge whether you do or do not expense any of the charges that you incur through our genuine meetings, but my view would be that if you do the value should be extremely limited.

• That you are meeting with at least two members of my team on separate occasions on a weekly basis, again resulting in an expense claim and non-attendance in the office. This is also not correct. You will have a need to meet with my team from time-to-time, but it is not at this frequency.

59.    The Plaintiff was profoundly disturbed upon receiving the letter from Mr. Davies, as he had never engaged in such misconduct. Furthermore, he was perplexed at how Ms. Ho could have any visibility into his expense claims or what time he returned home after a late night out engaging in 'further activities'.

60.    In an effort to find out more about the allegations contained in the Notice to Cease and Desist, the Plaintiff met with Mr. Davies on 4 September 2019. During the meeting, the Plaintiff learned that on 29 August 2019, Ms. Ho had dinner with Mr. Davies' fiancée, a Global Logistic Lead at TikTok, which is also a company the Western media promotes as having strong ties to the Chinese Government, and made the statements detailed in the Notice to Cease and Desist during the course of their meal.

20

61.     The Plaintiff also learned that the allegations
        containing late night 'further activities' had to
        do with visiting particular establishments located
        in the Wan Chai area of Hong Kong, which is a
        notorious and internationally known red light
        district.

62.     The Plaintiff understood that this naturally made
        Mr. Davies' fiancée upset and was the source of
        discord in their relationship. Thus, Ms. Ho had
        not only jeopardized Expeditors' business
        relationships with Lenovo but also his personal
        relationship with Mr. Davies by making the false
        allegations.

63.     The potential repercussions of these allegations
        were profound, carrying the weight to derail the
        careers of both the Plaintiff and Mr. Davies. Ms.
        Ho had insinuated that the Plaintiff was covering
        all of Mr. Davies' entertainment expenses. Such
        conduct, if true, would conflict sharply with the
        stringent policies of Expeditors, which strictly
        regulate the coverage of client entertainment costs
        to prevent conflicts of interest, breaches of

ethics, or violations of anti-corruption laws.

64.    Expeditors' policies are designed to ensure transparency and integrity in all business dealings, and any misrepresentation of expenses, especially those pertaining to client entertainment, could imply inappropriate financial conduct and could be seen as an attempt to unduly influence client decisions, which is strictly against company guidelines and industry regulations.

65.    Under Hong Kong law, the submission of fraudulent expense claims is considered a severe infraction, carrying the strong potential for custodial sentences upon conviction.

66.    In the logistics sector, characterized by rigorous enforcement of customs regulations and the handling of high-value goods across international boundaries, even a suggestion of criminal conduct can result in immediate and irreversible industry blacklisting. This not only irreparably damages an individual's professional standing but also severely disrupts their capacity to function within the intricate framework of the global supply chain.

67.    In accordance with Expeditors' policies and because
       Ms. Ho had engaged in serious misconduct in making
       false allegations regarding him, the Plaintiff
       immediately reported receipt of the email and
       Notice to Cease and Desist to his supervisor, Ms.
       Wang Ping Yap, who was based in Mainland China. Ms.
       Wang passed the information she received from the
       Plaintiff to the legal department.

68.    On 11 September 2019, the Plaintiff received an
       email from Ms. Cheung Hai Yiu, Corporate Counsel
       for Employment in the Asia Pacific region for
       Expeditors based in Singapore. In her email, Ms.
       Cheung expressed a desire to discuss with the
       Plaintiff the serious allegations brought forth by
       Ms. Ho, which had recently come to her attention.

69.    In the ensuing conversation with Ms. Cheung, the
       Plaintiff was dismayed to learn that Ms. Cheung's
       investigation was targeting him, despite him
       reporting Ms. Ho's alleged misconduct upon
       receiving the Notice to Cease and Desist.

70.    Ms. Cheung displayed gender bias in refusing to
       investigate Ms. Ho's infractions of the Code of
       Business Conduct, which applied to all employees
       of Expeditors and its subsidiaries. This bias was
       particularly concerning to the Plaintiff as Ms. Ho
       had made libelous allegations to an external party,
       thereby threatening the integrity of one of the
       company's most profitable global accounts.

71.    Ms. Cheung's questioning was overly aggressive and
       strikingly unprofessional, indicating of a deep-
       seated gender bias. The nature of her interrogation
       not only inappropriately cast the Plaintiff as the
       primary suspect but also as the culpable party—this
       despite his role as the victim of Ms. Ho's unfounded
       allegations.

72.    Ms. Cheung's pointed inquiries about the
       Plaintiff's personal interactions, especially
       those involving Mr. Davies and alleged drinking
       instances purportedly impacting his work, were
       wholly irrelevant and a blatant deflection from the
       substantive issue at hand.

73.     Furthermore, the Plaintiff was incensed by Ms. Cheung's blatant disregard for the reputational harm and baseless gossip being perpetrated by Ms. Ho, which was not only undermining his personal reputation but also jeopardizing the vital business relationship between Expeditors and Lenovo.

74.     Overwhelmed by the investigative process's apparent inequities, the Plaintiff forcefully conveyed his objections to Ms. Cheung via an email on 12 September 2019. A copy of the 12 September 2019 email from the Plaintiff to Ms. Cheung is appended to this document as **Exhibit 1.**

75.     In the 12 September 2019 email, the Plaintiff articulated his frustration with the disproportionate emphasis on the allegations against him while his own grievances against Ms. Ho were disregarded, in contradiction to Expeditors' professed open-door policy. The Plaintiff accused Ms. Cheung of misapplying Expeditors' policy to the detriment of his serious allegations, effectively marginalizing his complaints about Ms. Ho's conduct and her suspected violation of the Code of Business Conduct.

76.     Within the same email, the Plaintiff refuted any
        wrongdoing on his part and insisted on a thorough
        investigation into Ms. Ho's allegations, including
        a detailed audit of his expense reports. He also
        cautioned Ms. Cheung that he intended to closely
        examine the aftermath of the investigation, which
        was biased and lacked due process, with the aim of
        restoring his professional and personal reputation
        that had been called into question by Ms. Cheung's
        improper handling of his complaint.

77.     In the same email, the Plaintiff also referenced
        his oral agreement with Expeditors concerning his
        temporary role in Hong Kong. He outlined the terms
        of his assignment, which were to foster the
        business relationship with Lenovo, identify a
        suitable successor, and thereafter return to his
        original position in the Massachusetts office. Ms.
        Cheung, a corporate counsel, did not dispute the
        existence of this oral agreement in her
        communications.

78.     After concluding her investigation, Ms. Cheung
        determined that the accusations levied by Ms. Ho
        lacked any substantiation and were without merit.
        Nevertheless, she resolutely maintained that Ms.

Ho would not encounter any disciplinary action for her breach of Expeditors' Code of Business Conduct, invoking the company's open-door policy as justification.

79.   This decision was particularly confounding to the Plaintiff who perceived a gender bias in the leniency afforded to Ms. Ho. Despite his persistent inquiries, Ms. Cheung dismissed the necessity to clarify how the open-door policy exempted Ms. Ho's conduct considering her dissemination of false allegations to Mr. Davies' fiancée, an individual external to Expeditors and Lenovo.

80.   The Plaintiff's exasperation reached a critical point because of Expeditors' refusal to discipline Ms. Ho, fueled not only by what he deemed as Ms. Cheung's incompetence but also by gender bias in her handling of the entire situation. This bias, in his view, was exacerbating the threat to his essential relationships with Lenovo and Mr. Davies, as Ms. Ho's unprofessional behavior and the unfolding investigation continued unchecked.

81.     In a tense confrontation with Ms. Cheung, the
        Plaintiff, unable to contain his distress, resorted
        to emphatic language, including expletives, to
        vehemently convey his outrage at both the perceived
        discriminatory practices and the flawed
        investigative approach.

82.     The Plaintiff's already considerable distress over
        the failure of Expeditors to discipline Ms. Ho was
        exacerbated by the requirement to continue working
        near Ms. Ho, even as she spread damaging rumours
        about him, including unfounded allegations
        regarding visits to the red-light district in Hong
        Kong with Mr. Davies.

83.     These rumours, which constituted sexual harassment
        given their nature and potential to damage the
        Plaintiff's reputation, significantly compounded
        the hostile work environment he was forced to
        endure.

84.     Despite the Plaintiff's repeated appeals for
        intervention, both Expeditors and Expeditors HK
        staunchly refused to act. They asserted it was the
        Plaintiff's duty to manage a working relationship

with Ms. Ho, effectively ignoring his requests for
an environment that would safeguard his
professional integrity and emotional well-being and
demonstrating further gender bias.

## **Deteriorating Political Conditions in Hong Kong**

85.    Throughout the Plaintiff's tenure in Hong Kong, the
       region experienced significant political turmoil.
       The landscape was punctuated by frequent public
       demonstrations, which often escalated into
       confrontations between pro-democracy activists and
       governmental forces.

86.    It was during this period that anti-American
       sentiment surged, an uptick influenced by both
       global political narratives and a local wariness
       of foreign intervention. This shift in attitude was
       palpable and presented itself as a backdrop to the
       Plaintiff's professional activities in the area.

87.    Notable episodes that the Plaintiff was exposed to
       included witnessing large-scale protests, where
       hostilities between demonstrators and law
       enforcement escalated into confrontations.

88.     Additionally, the Plaintiff observed a disturbing
        incident at the Hong Kong International Airport
        through a live broadcast, where an individual—
        believed to be an undercover Mainland Chinese
        officer—was subjected to brutal treatment that can
        only be described as torture by a large group of
        protestors.

89.     Such events underscored the volatility of the
        situation in Hong Kong and painted a vivid picture
        of the risks present during the Plaintiff's
        assignment, especially since his biggest account
        was a company that Western media had promoted as
        having close ties to the Chinese government.

90.     Over time the situation in Hong Kong deteriorated
        significantly, protests frequently resulted in
        violent confrontations, not only in the streets but
        in targeted attacks on infrastructure symbolizing
        governmental authority. On multiple occasions,
        protestors besieged police stations, employing a
        range of tactics from blockades to vandalism, in a
        bid to challenge law enforcement responses.

91.     Moreover, the Plaintiff was alarmed by the storming
        of the Legislative Council ("**LegCo**") complex, an
        event comparable to the storming of the United
        States Capital on 6 January 2021, described as in
        insurrection by President Joseph Biden, which saw
        protestors forcefully gaining entry to LegCo and
        defacing parts of the building, an act that was
        broadcasted and widely reported by international
        news outlets.

92.     The Plaintiff avers that the response of the United
        States to the situation in Hong Kong is a matter
        of public record and included official statements
        of concern regarding the political unrest and
        instances of violence. The U.S. government, through
        its representatives and diplomatic channels,
        expressed support for the rights of the protestors.

93.     Furthermore, the Plaintiff notes that the U.S.
        response involved the enactment of legislation
        ostensibly aimed at supporting the pro-democracy
        movement and protecting human rights in Hong Kong.
        Notably, the Hong Kong Human Rights and Democracy
        Act of 2019, which was described by then Speaker
        of the House, Nancy Pelosi (D-CA), as a
        reaffirmation of "America's commitment to democracy

and human rights and the rule of law in the face
of Beijing's crackdown." was passed by the United
States Congress and signed into law, a move that
was met with mixed reactions within Hong Kong and
by the international community.

94.    The United States Department of State has also
issued a level 2 travel advisory warning its
citizens, "[s]ince the imposition of the National
Security Law on June 30, 2020, the People's
Republic of China (PRC) has demonstrated an intent
to use the law to target a broad range of activities
such as acts of secession, subversion, terrorism,
and collusion with foreign entities. The National
Security Law also covers offenses committed by non-
Hong Kong SAR residents or organizations outside
of the Hong Kong SAR, which could subject U.S.
citizens who have been publicly critical of the PRC
and/or the administration of the Hong Kong SAR to
a heightened risk of arrest, detention, expulsion,
or prosecution."

95.    The Plaintiff points to other significant
legislative developments in the United States,
specifically highlighting a bill introduced by a
bipartisan coalition of U.S. lawmakers, which

proposed sanctions on key Hong Kong judicial and
governmental figures deemed responsible for human
rights abuses. The Hong Kong Sanctions Act,
championed by U.S. Representatives Young Kim, Jim
McGovern, and John Curtis, targeted individuals
within the Hong Kong administrative apparatus,
including the justice chief, the police
commissioner, and appointed national security
judges, for punitive measures.

96.   This legislative initiative, aimed at holding 49
Hong Kong judges, prosecutors, and government
officials accountable, was a direct response to the
claim of erosion of legal protections and human
rights in the city by Western governments. The
proposal of sanctions by United States legislators
not only underscored the gravity of the situation
but also signalled a strong policy stance by the
United States against the actions of the Hong Kong
authorities.

97.   The Plaintiff asserts that such legislative actions
contributed to the intensified anti-American
sentiment that he witnessed. The proposal of the
Hong Kong Sanctions Act became a focal point of
contention, exacerbating the animosity towards

33

American entities and citizens in Hong Kong, and thereby compounding the Plaintiff's professional and personal challenges while on assignment in the region.

98.    The Plaintiff was also aware of Western media reports indicating that Mainland Chinese authorities pressured businesses operating in Hong Kong to remove senior expatriate personnel. These reports emerged from various sources, including the Canadian Broadcasting Company.

99.    The heightened political tensions and the increasing media fuelled anti-American sentiment in Hong Kong had tangible repercussions on the operations of multinational corporations, including Expeditors. The Plaintiff observed a shift in the tone and rhetoric within the company, as individuals began to express apprehensions regarding the prudence of maintaining American nationals in the Hong Kong office.

100.    Expeditors derives approximately 35% of its revenue from north Asia, thus it is important to the company to maintain positive relationships and a stable presence in the region. Given the geopolitical

climate, there were concerns that the apparent anti-American sentiment could potentially disrupt business continuity.

101.    In light of the Plaintiff's close ties to Lenovo and his political views, he found himself in an increasingly sensitive position. As a prominent American figure within the company, his association with a brand perceived to have close ties to the Chinese government posed a risk to one of Expeditors' biggest accounts.

102.    Furthermore, within the office, there were subtle insinuations and veiled comments, including from management, that hinted at the presence of pro-Hong Kong independence voices, which added an extra layer of complexity to the Plaintiff's professional and personal situation.

103.    To highlight the complexities of the situation the Plaintiff found himself in he points to the case of Samuel Phillip Bickett, an American national and a former compliance director at Bank of America Securities.

104.    The case of Mr. Bickett involved a physical
        altercation with a plain-clothes police officer
        during the 2019 Hong Kong protests. Mr. Bickett
        claimed he acted in self-defense after the officer,
        who was off-duty at the time, brandished a metal
        stick at a passer-by and did not immediately
        identify himself as a member of law enforcement.

105.    Despite Mr. Bickett's assertion of self-defense,
        he was convicted of assaulting a police officer and
        sentenced to imprisonment. The case drew the
        attention of the United States government, which
        expressed concerns regarding judicial independence
        and a fair trial.

106.    Beginning in February 2023, against a backdrop of
        increasing anti-American sentiment in Hong Kong,
        Expeditors and Expeditors HK engaged in a pattern
        of terminating American employees from the Hong
        Kong office, including Mr. Evan Cunningham and Mr.
        Jason Seo, allegedly due to performance issues.

107.    This pattern of terminations indicates a systematic
        effort by Expeditors HK to remove American
        nationals from their positions, which raises
        questions about the legitimacy of the stated

reasons for their dismissals.

108.    The Plaintiff contends that the proffered reasons for the terminations of Mr. Cunningham and Mr. Seo were pretextual. For instance, Mr. Seo's termination or forced resignation, ostensibly for performance deficiencies, contradicts the commendable performance reviews and the receipt of a performance bonus exceeding guaranteed minimums. This inconsistency points to a discriminatory motive behind the termination, especially when viewed in conjunction with the broader trend of terminating American staff.

109.    Furthermore, the subsequent transfer of the Plaintiff's responsibilities on the Lenovo account to Ms. Wang, who was based in Mainland China, following the Plaintiff's own abrupt dismissal, is indicative of a preference by Expeditors HK for non-American employees. The Plaintiff's dismissal and the immediate reassignment of his duties to a non-American individual is clear evidence of discrimination based on national origin.

**The President's Club Dinner**

110.    On August 17, 2023, the Plaintiff received a
congratulatory email from Mr. Tung Heng (TH) Chiu,
Vice President of Sales and Marketing for North
Asia at Expeditors, acknowledging Plaintiff's
selection as a President's Club awardee.

111.    The President's Club honour is bestowed upon the
top sales performers within each geographic region,
with Plaintiff being recognized for his exceptional
performance in the Asia/Pacific region that year.

112.    The same email extended an invitation to the
Plaintiff for an exclusive dinner event to
celebrate this achievement. The dinner was
scheduled to take place at the Brasserie in the
Rosewood Hotel, Hong Kong, on 21 September 2023,
from 6:30 PM to 9:30 PM., and Expeditors' senior
management, many of whom were from outside Hong
Kong, were slated to attend.

113.    The Plaintiff's track record of excellence with
Expeditors extended beyond his recent recognition.
He has a rich history of being honoured for his
exceptional sales performance, having previously

been acknowledged for his role as a GAM in Asia with similar accolades in 2021 and 2022.

114.    Additionally, the Plaintiff's outstanding contributions were celebrated in 2015 when he won the President's Club award for the Americas region. This consistent recognition over the years serves as a testament to the Plaintiff's dedication, skill, and sustained high performance.

115.    Moreover, the Plaintiff's esteemed standing within Expeditors was further exemplified by personal commendation from the company's CEO. In a heartfelt letter dated 1 February 2023, the CEO lauded the Plaintiff for his twenty-five years of dedicated service. This letter not only celebrated the Plaintiff's professional achievements but also expressed sincere gratitude for his role as an invaluable member of the Expeditors family.

116.    The CEO's acknowledgment of the Plaintiff, who had socialized at night with the CEO when he visited Hong Kong, extended beyond professional courtesies, highlighting the Plaintiff as a "colleague, a partner, and a friend" in his letter, thereby underscoring the depth of the Plaintiff's

integration into the fabric of the company's culture and its success.

117.   In the period leading up to the President's Club dinner, Mr. Kaiser Lam, a Regional Vice President of Expeditors, persistently encouraged the Plaintiff to attend the event. Mr. Lam also made multiple unsolicited comments indicating an intention to induce Plaintiff to consume alcohol, including statements that he was "going to get [Plaintiff] drunk."

118.   Mr. Lam's remarks were made despite Mr. Lam's knowledge—or the obligation to be aware—that Plaintiff was currently taking medication that could have adverse reactions if mixed with alcohol. Plaintiff felt pressured and concerned about the potential for alcohol-related interactions with their medication due to Mr. Lam's comments and the implicit expectations set forth by the company culture.

119.   On 21 September 2023, the Plaintiff attended the company-hosted dinner at the Brasserie located in the Rosewood Hotel to acknowledge and celebrate the exceptional performance of various members of

Expeditors HK, including himself.

120.   Throughout the dinner, the Plaintiff observed that numerous attendees, including Mr. Lam, consumed alcohol and participated in celebratory physical gestures, such as placing arms around colleagues. Mr. Lam was notably photographed in close physical contact with a male attendee, his ear near the attendee's head.

121.   Photographs from the event depict various individuals holding alcoholic beverages, yet those capturing the Plaintiff do not show evidence of intoxication despite being pressured to drink by Mr. Lam and on medication that could interact with alcohol consumption.

122.   The dinner took place in a small, well-lit room, which was under constant surveillance by numerous CCTV cameras, ensuring that everything that transpired during the event was recorded. The room was occupied by nearly two dozen individuals who were in attendance for the full duration of the event, alongside the venue's waitstaff who frequented the room consistently.

123.    The Plaintiff categorically denies engaging in any
        conduct that would justify his summary dismissal
        during the company awards dinner. As per the
        Plaintiff's knowledge, the event concluded without
        any incidents of note.

124.    To the best of the Plaintiff's knowledge, neither
        law enforcement nor the Rosewood Hotel staff were
        notified of any incident occurring on evening in
        question.

125.    The Rosewood Hotel, consistent with industry norms,
        retains CCTV footage for a minimum duration of
        between 30 and 90 days. This retention policy is
        in place to ensure the availability of video
        evidence for the review of incidents that may have
        occurred on the premises. It is understood that
        after the expiry of this period, CCTV recordings
        are overwritten in accordance with the hotel's data
        storage policies.

126.    The Plaintiff asserts that CCTV footage from the
        night of the company dinner on September 21, 2023,
        would have been available for retrieval and review
        to corroborate the Plaintiff's account of the
        evening's events and conduct had the incident been

reported or the footage requested in a timely manner.

127.    On 29 September 2023, the Plaintiff was included as a recipient of a mass email from Mr. Chiu, which was disseminated to all attendees of the dinner. This correspondence featured photographs from the event and provided a link to a video that encapsulated the evening's highlights. Copies of various photographs taken that evening have been duly appended to this document as **Exhibit 2.**

128.    Accompanying these visual mementos was a message from Mr. Chiu that extended further congratulations to the attendees. Notably, the content of this email was purely celebratory in nature, devoid of any indication that an untoward incident had transpired during the dinner.

129.    The tone and substance of Mr. Chiu's message reinforced the Plaintiff's assertion that the dinner concluded harmoniously and without any occurrence that could be construed as grounds for disciplinary action or termination.

## The HK Employment Agreement

130.    In the summer of 2023, the Plaintiff was approached
        by Mr. Allen Wang, Senior Vice President of North
        Asia for Expeditors, and Mr. Lam who requested that
        he enter into negotiations regarding a revision of
        his employment contract.

131.    Although the Plaintiff was operating under the
        Employment Agreement, which did not delineate a
        finite duration, Expeditors and Expeditors HK
        asserted that an amendment was necessitated to the
        Employment Agreement by the completion of a nominal
        five-year period ending on August 31—a term not
        previously stipulated or agreed upon.

132.    When the Plaintiff inquired as to the basis for
        this purported five-year limitation, Mr. Wang
        stated it was due to an unwritten company policy
        requiring American employees to convert to local
        employment contracts after five years of
        international assignment in Asia. However, the
        Plaintiff was never made aware of nor did he agree
        to such a policy when he commenced his assignment
        in 2018.

133. No documentation of this alleged policy was provided to the Plaintiff.

134. During these discussions, Mr. Wang and Mr. Lam demanded Plaintiff agree to a decremented salary, amounting to a USD 5,000.00 reduction in his monthly earnings. This proposed salary adjustment was framed as a routine transition for expatriate employees who supposedly were expected to assimilate to local employment conditions after a five-year tenure—a policy the Plaintiff was neither aware of nor consented to at the inception of his employment or at any time thereafter.

135. The Plaintiff, relying on the oral agreement with Expeditors that guaranteed his status as a temporary assignee to Hong Kong and affirmed his reassignment back to Massachusetts, refused to accept a compensation package that reflected a diminished salary. This understanding underscored the Plaintiff's expectation that he would maintain his existing remuneration until such time as a suitable successor was positioned to manage the Lenovo account, after which he would repatriate.

136.   The insistence on a salary reduction for the
       Plaintiff by Expeditors was in direct contravention
       of the foundational terms of his assignment and
       indicative of a unilateral deviation from
       previously agreed-upon conditions of employment.

137.   The Plaintiff's steadfast refusal to acquiesce to
       a reduction in compensation precipitated a period
       of pronounced uncertainty that persisted through
       September 2023.

138.   Based on information and belief, during this time,
       a senior member of management at Expeditors,
       emerged as an advocate for the Plaintiff and
       actively lobbied on behalf of the Plaintiff,
       applying significant pressure on Mr. Wang and Mr.
       Lam to maintain the Plaintiff's original
       compensation package.

139.   Mr. Wang and Mr. Lam harboured discontent with the
       intervention by a senior member of management and
       were resistant to disbursing the compensation
       sought by the Plaintiff. It is alleged that their
       reluctance stems from a concern over adverse
       budgetary repercussions, including the potential
       necessity for local workforce reductions to offset

the financial outlay of meeting the Plaintiff's compensation demands.

140.   Despite the Plaintiff's unwavering commitment and demonstrated value to the company, he was informed that Expeditors also intended to discontinue his housing allowance—a benefit that had been a critical component of his expatriate compensation package. This abrupt and one-sided alteration signalled a considerable reduction in the Plaintiff's employment benefits, undermining the stability and expectations set forth at the outset of his international assignment.

141.   Confronted with persistent efforts to impose a revised contract in contradiction to the explicit provisions of his verbal agreement, the Plaintiff communicated his concerns to his supervisor, Ms. Wang, on several occasions. He expressed a desire to return to his homebase in Massachusetts in accordance with the terms of his oral agreement with Expeditors, especially since Expeditors did not seem to be genuinely seeking a replacement to take over the Lenovo account.

142.    As the Plaintiff was attending to his duties at his desk on September 25, 2023, he was approached by Ms. Angel Tam, Regional Manager, Administration and Employee Relations Hong Kong, Taiwan, Japan & Korea for Expeditors, who presented him with a new employment agreement (the "**HK Employment Agreement**").

143.    Contrary to the Plaintiff's expectations and his previous oral agreement with Expeditors, this proposed agreement designated Expeditors HK as his employer, rather than the United States based Expeditors entity under which he had been previously employed.

144.    This development was unexpected and disconcerting to the Plaintiff, as recent discussions had led him to believe that his compensation terms, which were vehemently opposed by Mr. Wang and Mr. Lam, would not be met, resulting in his imminent relocation back to Massachusetts and return to his base of employment in Peabody. The sudden presentation of a new agreement with altered employment terms caught the Plaintiff off guard and was inconsistent with the outcome he had been led to expect.

145.    At the time Expeditors and Expeditors HK proffered
the employment contract to the Plaintiff, they were
already in possession of undisclosed allegations
of sexual harassment against him, which they did
not share with the Plaintiff prior to his signing
of the new contract.

146.    The Plaintiff contends that the true motive behind
the execution of the HK Employment Agreement was
to strategically circumvent the protections
afforded by the law of the United States and avoid
having to pay for his relocation back to
Massachusetts should they wish to terminate him.

147.    This manoeuvre appears to have been a calculated
effort by Expeditors and Expeditors HK to
facilitate the Plaintiff's termination,
effectively exploiting the jurisdictional
complexities to their advantage and to the
Plaintiff's detriment.

148.    Although the Plaintiff harboured reservations
regarding the sudden shift in his employment terms,
he acquiesced and signed the HK Employment
Agreement on the same day it was presented to him.

The Plaintiff's decision to proceed was influenced by the fact that the compensation stipulated within the new agreement closely mirrored that of his original Employment Agreement and his desire to benefit his employer.

149.    As a dedicated and loyal member of the organization, the Plaintiff prioritized the interests of the company, choosing to continue his professional contributions despite the personal and considerable sacrifices he had already endured as part of his relocation to Asia. This decision was made in good faith, with the understanding that his efforts were instrumental in securing a qualified successor for the Lenovo Account, thereby fulfilling a key company objective.

150.    The Plaintiff asserts that, in accordance with Hong Kong law, it is unlawful for an employer to summarily dismiss an employee for acts that occurred prior to the execution of an employment contract and commencement of his employment, particularly when such acts were known to the employer at the time the contract was entered into and commenced.

151.    This principle is enshrined in the Employment
        Ordinance (Cap. 57) of the Laws of Hong Kong, which
        prescribes the lawful grounds and procedures for
        termination of employment and applicable Hong Kong
        caselaw, including *Cheung Chi Wah Patrick v. Hong
        Kong Cement Company Limited* [2016] HCLA 18.

### The Allegations

152.    On an unspecified date in October 2023, the
        Plaintiff received a communication from Ms. Cheung,
        whose last interactions with the Plaintiff involved
        the confrontation in which the Plaintiff used
        expletives due to her incompetence and bias with
        respect to her so-called investigation into the
        false allegations Ms. Ho had levelled against him,
        wherein he was confronted with an allegation of
        sexual harassment purported to have taken place at
        the awards dinner on September 21, 2023, hosted at
        Brasserie in the Rosewood Hotel.

153.    During this exchange, Ms. Cheung charged the
        Plaintiff with having engaged in non-consensual
        contact by kissing the shoulder of Ms. Bonbon Lau,
        a District Sales Representative at Expeditors HK,

whom the Plaintiff had never met prior to that evening.

154.    The accusation, as presented by Ms. Cheung, was notably deficient in detail; it lacked any specification regarding the timing or the exact location within the venue where the alleged incident was claimed to have occurred. This absence of particularity left the Plaintiff without the necessary context to adequately address or refute the claim laid against him.

155.    The oral notification of the alleged incident during the awards dinner served as the Plaintiff's initial indication of any allegations of inappropriate conduct occurring at the event. The Plaintiff was utterly taken aback by this revelation, as it was wholly unexpected and contrary to his understanding of the evening's proceedings.

156.    Ms. Cheung, who was still stationed in Singapore, issued a directive to the Plaintiff not to speak with anyone regarding the matter under investigation until further notice. The Plaintiff interpreted this as an explicit instruction to

refrain from communicating with any parties, including potential witnesses who might hold exonerating evidence pertinent to the incident and attorneys, under the threat of punishment. Subsequently, Ms. Cheung proceeded to conduct an 'interview' with the Plaintiff regarding the allegations.

157. Throughout the interview carried out by Ms. Cheung, the Plaintiff endured a line of questioning that was not only markedly adversarial and aggressive but also tinged with gender bias. Ms. Cheung's manner and method of inquiry betrayed a predisposed conviction of the Plaintiff's culpability, which was especially evident in her gendered accusations.

158. Ms. Cheung baselessly alleged that the Plaintiff had selectively engaged only with female attendees during the dinner event, a claim unsubstantiated by any evidence and indicative of gender bias. This assertion not only misrepresented the Plaintiff's interactions but also insinuated inappropriate behaviour based solely on the gender of the dinner attendees, thereby perpetuating stereotypes.

159.    Furthermore, by pressing the Plaintiff to
        conjecture about Ms. Lau's motives for initiating
        the accusation, Ms. Cheung's insinuations of guilt
        appeared to draw from gendered assumptions rather
        than objective analysis or factual corroboration,
        thereby compounding the discriminatory undertones
        of her interrogation.

160.    Ms. Cheung's reticence to provide comprehensive
        details concerning the alleged incident continued,
        merely indicating that the matter had been promptly
        reported to Mr. Lam. In the face of Ms. Cheung's
        insistent probes regarding the reasons behind the
        Plaintiff's supposed conduct, the Plaintiff
        consistently affirmed his innocence and noted a
        lack of memory regarding any significant events at
        the dinner.

161.    Notably, when Ms. Cheung questioned the Plaintiff
        about his recollection of Ms. Lau's attire, he
        referred to Ms. Lau's own statements attesting to
        the suitability of her dress in accordance with the
        company's rigorous dress code standards. Ms.
        Cheung, however, chose to interpret this factual
        recounting as a deflective tactic, accusing the
        Plaintiff of attempting to place undue blame on Ms.

Lau.

162.    This misrepresentation of the Plaintiff's attempt to simply provide an accurate description of the evening indicates a gender bias, insinuating that the Plaintiff's comments were intended as victim-blaming based on Ms. Lau's clothing choice—a classic example of gendered stereotyping.

163.    On 2 November 2023, the Plaintiff received an email from Ms. Cheung. The email stated:

This email is to inform you that the investigation into the sexual harassment complaint made against you by Bonbon Lau is completed.

Below is a summary:

1. Details of Allegation: It was alleged that during the president club dinner event organized by the company on 21 September 2023, you were having a conversation with Bonbon when you suddenly grabbed her arm and kissed her exposed shoulder a few times in quick succession. She immediately reported this to Kaiser Lam.

2. Details of Findings: None of the witnesses interviewed saw the incident first hand. However, the following statements were provided:

All witnesses who were interviewed confirmed that you appeared drunk during the event. Two female witnesses reported experiencing inappropriate behaviour from you during the event one reported that you put your arm around her shoulder and put your head very close to hers (almost touching her ears). She had to avoid you by pushing you away. At one point, you told everyone that "she's your girl" and asked her to tell everyone that she is your girl and asked her to call you "dad". one

reported that you told her "I love you" as she was
parting ways with you.

You are required to attend a disciplinary hearing
tomorrow, 3 November 2023, at 12pm, where you will
have the opportunity to present your position. The
meeting will be conducted by Kaiser Lam. I will
also be present.

You will receive a meeting invite from me shortly.
If you are unable to attend the disciplinary
meeting at the time and date above.

164.    The email from Ms. Cheung dated 2 November 2023,
        regarding the conclusion of the investigation into
        the alleged incident was the Plaintiff's first
        receipt of any formal notification related to the
        specific nature of the allegations and the findings
        of said investigation.

165.    The 2 November 2023 email did not afford the
        Plaintiff adequate time to prepare a defence, as
        the disciplinary hearing was scheduled for the very
        next day and the investigation was already
        completed.

166.    The summary provided in the email lacked crucial
        details regarding the incident and failed to
        include any exculpatory evidence or testimony that
        may have been favourable to the Plaintiff,
        suggesting a one-sided account of the events in

question.

167.    The email's assertion that the investigation was
        completed was undercut by the admission that none
        of the interviewed witnesses, who were unnamed, had
        observed the alleged incident.

168.    The email's reference to witnesses interviewed is
        also ambiguous and lacks specificity, as it does
        not disclose the total number of witnesses
        consulted during the investigation or the names of
        the witnesses that were interviewed.

169.    These omission prevented the Plaintiff from
        understanding the full scope of the inquiry and
        assessing the extent to which the investigated
        accounts were comprehensive and fairly sought.

170.    By not providing a comprehensive list of
        interviewed witnesses and their statements (if any
        were taken), the email deprived the Plaintiff, who
        had previously been instructed not to speak with
        anyone by Ms. Cheung, of the opportunity to
        challenge the findings, to understand the basis for
        the conclusions drawn, and to prepare an effective
        defence for the disciplinary hearing.

171.    The allegations of the Plaintiff's apparent intoxication and inappropriate behaviour with other female attendees, as mentioned in the email, and who remained unnamed, were presented without context or substantiation. No effort was made in the email to distinguish between observed behaviour and behaviour that might have been misinterpreted or exaggerated, nor was there any indication that alternative explanations were considered.

172.    The appointment of Mr. Lam to preside over the disciplinary hearing presents a serious conflict of interest, given his dual role as both a recipient of the initial complaint and a critical witness to the events in question.

173.    Mr. Lam's presence at the time of the alleged incident and his subsequent failure to observe the reported actions of the Plaintiff, despite having an unobstructed view that should have allowed him to witness the event, renders him an exculpatory witness for the Plaintiff.

174.    Mr. Lam's role in the investigative process was not
        only inappropriate but actively detrimental to its
        impartiality. His decision to involve himself in a
        dual capacity, both as a senior member of the
        company with influence over the investigation and
        as an individual who had expressed an intent to
        intoxicate the Plaintiff at the dinner, severely
        compromised the integrity of the disciplinary
        proceedings and foreclosed an objective
        investigation into management's conduct that
        evening.

175.    Moreover, Mr. Lam's direct opposition to the
        Plaintiff's HK Employment Agreement due to
        budgetary constraints further tainted his
        involvement in the disciplinary process. His
        previous resistance to the Plaintiff's hiring on
        the grounds of financial prudence provided him with
        a vested interest in the outcome of the
        proceedings.

176.    Allowing Mr. Lam to participate in the disciplinary
        action against the Plaintiff not only introduced a
        clear conflict of interest but also raised the
        spectre of financial motivation behind the decision
        to terminate the Plaintiff's employment. Such a

scenario undermines the fairness of the process and suggests that the disciplinary measures could be a pretext for Mr. Lam to alleviate budgetary pressures rather than a response to the Plaintiff's alleged misconduct.

177.    The presence of Ms. Cheung at the disciplinary hearing, who had not only shown a confrontational and biased disposition in prior dealings with the Plaintiff, but also exhibited signs of gender bias in her treatment of him, also gravely compromised the impartiality of the proceedings.

178.    The Plaintiff's previous use of expletives when addressing Ms. Cheung, as noted in earlier interactions, was indicative of the heightened tensions fostered by her bias.

179.    Additionally, Ms. Cheung's email failed to specify the potential consequences of the disciplinary hearing or the range of disciplinary measures under consideration, depriving the Plaintiff of the opportunity to fully understand the gravity of the situation and to prepare accordingly.

## The 3 November 2023 Hearing

180.    The configuration of the disciplinary hearing held
        on 3 November 2023, which necessitated Ms. Cheung's
        participation via videoconference from Singapore,
        resulted in a spatial arrangement that placed the
        Plaintiff in an inequitable position.

181.    Both the Plaintiff and Mr. Lam were required to
        share the camera frame for the video feed,
        compelling them to sit in close proximity to one
        another. This forced proximity to Mr. Lam, who was
        not only the adjudicator of the hearing but also a
        key witness, exerted undue psychological pressure
        on the Plaintiff and hindered the Plaintiff's
        ability to present his case under conditions of
        neutrality and without intimidation.

182.    Throughout the course of the disciplinary hearing,
        there were multiple instances where Mr. Lam engaged
        in physical contact with the Plaintiff by placing
        his arm around the Plaintiff's shoulder. This
        contact was unsolicited and non-consensual, with
        the Plaintiff having no opportunity to object to
        or avoid such personal encroachment.

183.    The inappropriate physical interactions initiated
        by Mr. Lam not only invaded the Plaintiff's
        personal space but also conveyed a disregard for
        professional boundaries, which is particularly
        troubling given the nature of the allegations under
        review.

184.    The behaviour of Mr. Lam is indicative of the
        gender-biased perception of acceptable conduct
        within Expeditors, as it highlights a double
        standard where similar allegations made against the
        Plaintiff are subject to scrutiny and disciplinary
        action, while comparable behaviour by Mr. Lam goes
        unexamined.

185.    At the outset of the so-called disciplinary
        hearing, Ms. Cheung prejudicially stated her belief
        in the veracity of the allegations against the
        Plaintiff, or expressed words to that effect, which
        immediately set a tone of bias and presumption of
        guilt, thereby undermining the presumption of
        innocence to which the Plaintiff was entitled.

186.    Ms. Cheung also introduced a new narrative in which
        Ms. Lau reportedly fled the room and communicated
        the incident to Mr. Paul Lau, a separate employee

of Expeditors, who bears no familial relation to Ms. Lau. This revelation was presented to the Plaintiff for the first time during the hearing, diverging from the initial account that the incident was directly reported to Mr. Lam.

187.    The introduction of this conflicting account without prior notice effectively ambushed the Plaintiff, who, as a result of this procedural impropriety, was not able to effectively respond or present information that may have questioned the reliability or motives of either Mr. Lau or Ms. Lau.

188.    Given a fair and adequate opportunity to mount a defence, the Plaintiff would have introduced evidence that could potentially impeach the credibility of Mr. Lau and Ms. Lau.

189.    This evidence includes an account from a witness who purportedly had information relating to Mr. Lau and Ms. Lau's relationship.

190.    The Plaintiff could have also submitted evidence of a disturbing episode involving Mr. Lau, which would give him a motive to fabricate allegations

against the Plaintiff.

191.    The Plaintiff's inability to present this information due to the unexpected and unannounced shift in the narrative of the allegations deprived him of the chance to illustrate potential bias and ulterior motives. The lack of advance notice effectively ambushed the Plaintiff, compromising his ability to effectively defend himself.

192.    It was only during the hearing that the Plaintiff was made aware of the specific location and time that Ms. Lau alleged the incident took place. This critical information was withheld until the hearing, depriving the Plaintiff of the opportunity to conduct a thorough and informed preparation of his defense.

193.    For example, as the incident was now alleged to have occurred mid-way through the evening and was reported to Mr. Lam, the Plaintiff could have highlighted Mr. Lam's silence on the matter throughout the remainder of the evening, which is incongruous with the actions a senior leader would be expected to take if an employee was drunk, only talking to women, and randomly grabbing them and

kissing them on exposed body parts in a crowded, well-lit room packed with senior management during an awards dinner.

194.    Ms. Cheung also refused to tell the Plaintiff whether she had pursued the collection or examination of objective evidence that could corroborate or contradict Ms. Lau's account of the events.

195.    The failure to secure, or even to clarify whether an attempt was made to preserve, the CCTV footage from the Rosewood Hotel for the relevant evening represents a significant oversight in the investigation. Such footage, which the Plaintiff maintains was exculpatory, would have offered an unbiased and accurate record of the interactions between the parties and was fundamental to establishing the facts of the case.

196.    Moreover, Ms. Cheung did not provide information on whether she had sought to review communication records that could shed light on the context and dynamics between the involved parties. This includes text messages exchanged between Ms. Lau, Mr. Lau, and Mr. Lam, which might have contained

contemporaneous descriptions of the alleged incident, inconsistent statements or indications of their respective states of mind at the time of the Plaintiff's alleged misconduct.

197.    Ms. Cheung also did not indicate whether she made any attempt to collect additional forms of electronic evidence such as photographs or videos taken by any of the attendees during the event in question. Such media could potentially validate the presence, behaviour, and interactions of the individuals involved, thereby contributing valuable insights into the alleged incident.

198.    The absence of these basic investigative actions and failure to adhere to proper procedure, including following the Code of Business Conduct, not only demonstrates a complete lack of neutrality on the part of Ms. Cheung but also indicates gender bias in her approach to gathering comprehensive evidence. By neglecting to exhaustively pursue all pertinent forms of evidence, including those that may have illuminated the context of the interactions without a gendered lens, the investigation fell well short of the objective standards required to ensure an equitable and

thorough examination of the events.

199.  The Plaintiff's defence was significantly disadvantaged by Ms. Cheung's omissions, as they compromised his ability to present a compelling and factually supported response to the allegations made against him.

## **The Summary Dismissal**

200.  On 11 December 2023, the Plaintiff was summoned to a meeting where Mr. Lam was present in person, again sitting adjacent to him, while Ms. Cheung, Ms. Wang (the Claimant's supervisor), who was also present at the dinner, and another individual participated remotely from outside Hong Kong via video link.

201.  During this meeting, Ms. Wang, who was still located in Mainland China, proceeded to read a letter formally announcing the termination of the Plaintiff's employment with the company, citing "serious misconduct" as the cause, specifically alleging that the Plaintiff had grabbed Ms. Lau's arm and kissed her shoulder on multiple occasions without her consent, an allegation which the

Plaintiff repeatedly denied.

202.  After hearing that he had been terminated after 25 years of impeccable service without being afforded even a modicum of due process, the Plaintiff became visibly upset and was crying. Devasted, the Plaintiff attempted to leave the office as he had been summarily terminated for an act he did not commit and branded a sexual harasser.

203.  Expeditors and/or Expeditors HK's departure protocol significantly deviated from the standard expectations for an individual who dedicated a quarter-century of service to the company, devoid of any traditional acknowledgments such as a commemorative gold watch, a farewell celebration, or even the provision of psychological counselling to mitigate the shock and distress associated with such an abrupt conclusion to a long and distinguished career.

204.  Instead, Mr. Lam exhibited an aggressive disregard for the Plaintiff's autonomy by forcibly grasping the Plaintiff's arm in an effort to prevent his departure.

205.    Mr. Lam further insisted that the Plaintiff could
        not go home after he was fired because he was
        obligated to dedicate an additional three hours to
        the company, under the pretext that he had been
        remunerated for a complete day's work, and was
        expected to utilize this time to facilitate the
        transition of the Lenovo account to Ms. Wang, an
        account that was now generating approximately **$45-
        $60M** per year in profit for Expeditors.

206.    The official correspondence provided to the
        Plaintiff detailing his summary dismissal, as
        articulated by Ms. Wang, delineated the following
        grounds for termination:(a) The Plaintiff's alleged
        actions were characterized as acts of sexual
        harassment and labelled as severe violations of
        Expeditors' Code of Business Conduct;(b) The
        company expressed concern regarding the Plaintiff's
        lack of ownership or remorse over the actions
        attributed to him. The Plaintiff was accused of
        initially blaming the alleged victim, Ms. Lau
        (referred to as "Bonbon"), by questioning her
        compliance with the Company's dress code, which was
        deemed concerning; and (c)the Plaintiff was accused
        of lying in an attempt to deflect blame onto
        management by claiming intoxication facilitated by

the company itself.

207.   Notably, Mr. Lam, the very person the Plaintiff alleges coerced him into consuming alcohol, was entrusted with a role in the ensuing investigation and disciplinary hearing. In a turn of events that raises questions about the objectivity of the proceedings, it was this same investigative body that included Mr. Lam which concluded that the Plaintiff's accusations were fabricated.

208.   Expeditors and Expeditors HK also pointed to this being the second allegation of sexual harassment made against the Plaintiff.

209.   Neither Ms. Cheung nor Mr. Lam gave the Plaintiff any indication prior to the convening of the meeting on 11 December 2023 that historical allegations of sexual harassment would be invoked in considering whether to discipline him. It is critical to underscore that the only antecedent instance of a sexual harassment claim involving the Plaintiff dates back to the period of 2014 to 2015, a tenure affiliated with Expeditors and not with Expeditors HK.

210.    This previous accusation lacked corroboration and, unlike the allegations here, was properly investigated, which led to the discovery of text messages on the accuser's mobile device by Expeditors that revealed an ulterior motive to fabricate the allegations. The messages revealed an intent to malign the Plaintiff unjustly, with the aim of advancing the accuser's own career at the expense of the Plaintiff due to his gender, all the while internally conceding to the Plaintiff's non-involvement in any form of sexual misconduct.

211.    At the time of the previous accusation, the Plaintiff was based in Massachusetts and the investigation took place within that jurisdiction.

212.    Despite determining through its investigation that the prior allegation was demonstrably false based on clear evidence of an ulterior motive to lie, Expeditors, to the best of the Plaintiff's knowledge, took no documented disciplinary or corrective action against the accuser.

213.    This disparity further reflects the dismissive manner in which Expeditors treated legitimate complaints of misconduct when brought by male employees, particularly regarding matters of sexual harassment or gender bias.

214.    The inclusion of this fully investigated and discredited allegation in the current case represents a flagrant display of gender bias, serving to unjustly colour the perception of the Plaintiff's character and conduct, in that the Defendants were using one false allegation to bootstrap another in an attempt to justify the Plaintiff's unlawful summary dismissal.

215.    Despite the lack of substance to the previous claims, the Plaintiff does acknowledge that he received a warning based on the incident. The company's protocol, which is improper, dictates that a formal warning be issued against an employee facing a serious allegation, to be kept on record for reference in any future disciplinary matters, regardless of whether the accusation was ultimately proven to be false or malicious.

216.    It is alleged, on the basis of information and belief, that the CEO of Expeditors personally sanctioned the termination of the Plaintiff's employment, notwithstanding the reported disapproval of this measure by several senior management members.

217.    It is purportedly a recognized pattern within the company that the CEO typically endorsed the dismissal of employees under the shadow of sexual harassment allegations made by female employees against their male counterparts, this practice seemingly prevails irrespective of the substantive evidence, or the absence thereof, that might exist to support such claims.

218.    As the Plaintiff exited Expeditors HK for the final time, Mr. Lam referenced the CEO's policy. He indicated to the Plaintiff that the termination decision was a foregone conclusion due to the nature of the allegation, specifically a claim of sexual harassment made by a female against a male, and that once such a matter came to the CEO's attention, the outcome was predetermined.

**<u>Unveiling the CEO's Covert Termination Strategy</u>**

219.    Prior to the Plaintiff's termination, Expeditors publicly and prolifically promoted its steadfast commitment to a no lay-off policy branding itself as a paragon of employee job security, particularly in economic downturns. This policy was not merely a statement but a fundamental aspect of the company's culture, as the Plaintiff understood.

220.    Expeditors' external communications, including its website and annual proxy statements for 2020 and 2021, consistently reinforced the company's no lay-off policy. These documents served as a testament to the company's pledge to its employees and shareholders.

221.    The Plaintiff, however, later discovered that the CEO had secretly developed a plan to reduce the workforce by 2,000, a stark deviation from the company's stated no lay-off policy, which casts doubt on the authenticity of Expeditors' public stance on layoffs, undermining the company's integrity and trust in its commitments.

222.    In an email dated January 24, 2023, distributed only to senior leadership and prominently marked not for further dissemination, the CEO of Expeditors stated:

**STRICTLY CONFIDENTIAL - FOR INTERNAL USE ONLY - DO NOT FORWARD OR DISSEMINATE**

Let me start this email by saying that it was great seeing each of you at the DM Meetings in London, Seattle or Singapore. As I said in the DM Meetings, you and your teams have done an incredible job over the last couple of years navigating the pandemic and while still going through impacts from the pandemic and managing through our cyber-attack. We've never faced a more challenging time in our history, and I am extremely proud of how we responded. We protected our employees and at the same time protect our business.

As I also said in the DM Meetings, we are now enter a year of new challenges. Rates are returning to pre-pandemic levels and demand is dropping as a result of the global economic environment. This is all happening much faster than we ever expected so it is imperative that we respond quickly. Even though we have discussed the changes taking place, I am not confident that everyone truly understands the impact this will have on our business. The purpose of my email is to draw additional attention to this situation and spur immediate action.

Our two larges expenses are direct transportation and personnel costs. Our direct transportation costs are being reduced simply based on the declining market. Our personnel costs do not and will not decline without action by you.

During the past two years we added roughly 2,000 new staff to our headcount. We did this not because our volumes grew but because our business changed. Certain locations were handling significantly more business than they had done previously (think key gateway locations) and all locations were required to devote more time, effort and work to handle our current business. This was the first time in our history that we hired people not because our volumes increased but instead

because of the complexity of our business increased. We were able to do this based on the increased rates and profitability. Unfortunately, the rates have now declined, and we can no longer support the expense of the additional headcount.

In a normal period, we could simply deal with the additional headcount through attrition and not hiring additional staff. We are NOT in a normal period. As stated above, rates have dropped significantly which has had a large impact on our profitability and at the same time, volumes are dropping quickly. It is likely that we are overstaffed by more than the growth in staff over the last two years based on current volumes.

I continue to hear people say that we are a company that does not do layoffs. This is a true statement based on our history, but we've never been in a period where we were overstaffed by 2,000 employees and then experienced a significant drop in volumes. In all previous circumstances, we were dealing with a situation where we were staffed appropriately for our current business and then experienced a drop in volumes due to economic conditions. In the past, we were dealing with an overstaffing of approximately 10% whereas now it could be as high as 20%.

Many companies, including a large number of our customers are or have implemented layoffs. Details on some of the largest layoffs are listed below:

Microsoft:  10,000
Google:  12,000
Meta:    11,000
Amazon:  18,000
Salesforce: 8,000

These companies are terminated staff as they have seen a large downturn in business and do not expect things to correct themselves in the short term.

My message to you as District Manager or leader in this company is this: while we have never had a layoff in our company to date, we do not have a policy that states we will not do layoffs. We are significantly overstaffed based on our current volumes. We all know how we got here but we are all responsible for getting us back to a manageable level.

We will not hire any additional staff. If a person leaves, and their role is critical, you must back fill with an employee that is already on staff. Any other exceptions to this policy will be made by me or one of my direct staff members.

Additionally, you must begin the process of trimming your current underperforming staff. If you have team members who are not performing, do not meet our culture, or simply do not want to be part of our team, it is time to let them go. Of course, this must all be backed up with appropriate reviews and documentation showing that we have been working with these staff members.

Your job is to protect our employees. As difficult as it might be, letting poor performers go is in the best interest of protecting our employees. Our model only works when we are staffed with employees who believe in how we are and what we do and, at the same time, our revenues and expenses are in-line with one another.

I do not want to see a change in our history of layoffs but I simply can't make the necessary changes on my own. You have the ability to prevent a layoff and I am confident you will do the work to get our expenses/headcount/revenues back in-line. Time is of the essence and this needs immediate attention and action.

223. Buried in the Form 10-Q filed by Expeditors with the United States Securities and Exchange Commission for the quarter ending 30 September 2023, was the following statement, "salaries and related costs decreased 17% for both the three and nine months ended September 30, 2023, as compared with the same periods in 2022, principally due to decreases in commissions and bonuses earned from

lower revenues and operating income. While headcount decreased 8% in 2023, base salaries and benefits remained flat primarily due to inflationary conditions."

224. Expeditors' 2022 Annual Report disclosed a workforce totalling approximately 20,000 employees as of December 31, 2022. Thus, an 8% reduction in its workforce would amount to a cut of 1,600 employees.

225. The Plaintiff, based upon information and belief, maintains that the total workforce reduction at Expeditors from the date of the CEO's email until now is 10 percent (2,000 employees).

226. For context, historical data dating back to 1995 indicates that the company's most significant previous reduction occurred in 2009, involving 570 employees—less than a 5% decrease from the workforce at that time. This comparison underscores the exceptional scale of the workforce reduction accomplished in just 9 months.

227.    Corroborating the internal email, a Glassdoor.com post of 9 March 2023, by an individual claiming to be a current manager at Expeditors in Seattle, Washington, declared that the company was conducting layoffs covertly. The post's mention of an overstaffing issue by 2,000 employees—identical to the figure cited by the CEO in the confidential email—lends additional weight to the allegations, despite the Plaintiff's general reservations about the reliability of anonymous internet postings.

228.    Expeditors and its CEO never disclosed to its shareholders that it intended to reduce its workforce by 10 percent via 'performance based' terminations and forced resignations, as described more fully below.

229.    Expeditors and Expeditors HK have also orchestrated a scheme to effectively reduce its workforce by means of engineered resignations, thereby circumventing the traditional and public process of layoffs. Certain employees were deliberately targeted and informed about their purported underperformance, with the subsequent threat of impending termination by the month's end. These

employees were presented with an ostensibly benevolent alternative: resign voluntarily and receive a favourable reference, along with a suggestion of potential rehire in the future.

230.    As described previously, Mr. Seo was singled out under the pretext of underperformance, despite having received a positive performance evaluation and a bonus exceeding the guaranteed amount. Mr. Seo was approached with the aforementioned strategy, suggesting a patterned practice by Expeditors and Expeditors HK of using misleading performance critiques to facilitate involuntary resignations.

231.    It is deeply troubling that Mr. Jeffrey Musser, CEO of Expeditors—a company that prides itself on its pro-worker stance and staunch no-layoff policies— would engage in behaviour that starkly contradicts these values. It is alleged that Mr. Musser manipulated employees by insinuating their underperformance and pressuring them to voluntarily resign with the enticement of a favourable reference.

232.   This implication carries the menacing undertone that non-compliance would result in Expeditors providing a negative or no reference, casting a shadow over the integrity of the company's leadership and its professed commitment to its workforce and the ethical principles it so proudly champions in its Code of Business Conduct.

233.   Based upon information and belief, managers were told that they needed to implement the scheme to keep Expeditors' stock price up to prevent it from becoming a takeover target.

234.   Through implementation of the CEO's clandestine workforce reduction program as outlined in the January 2023 email, it is alleged that Expeditors terminated or pressured resignations of employees across various operations and subsidiaries, including those located within Massachusetts. At the time the program was initiated, Expeditors maintained an office in Peabody, Massachusetts employing approximately 120 individuals.

235.   Expeditors employees located in Massachusetts, including Mr. Michael Carrabes, were terminated or forced to resign as a result of the covert program and in violation of Title VII of the Civil Rights Act of 1964 or other anti-discrimination statutes.

236.   Following the Plaintiff's termination, he was also presented with a so-called separation agreement, which was overwhelmingly skewed in favour of Expeditors and Expeditors HK.

237.   The proposed agreement characterized the Plaintiff's departure as by mutual agreement, which was false as he was summarily dismissed, and incorporated clauses that singularly benefited Expeditors and Expeditors HK: a unilateral non-disparagement clause, a settlement of all claims clause and a confidentiality clause, effectively silencing him from discussing the circumstances surrounding his termination.

238.   Additionally, the proposed agreement contained a forum selection clause mandating that any legal disputes be exclusively resolved by the courts of the Hong Kong Special Administrative Region, a provision that was an attempt by Expeditors to

evade scrutiny of its unethical and unlawful actions by American courts, including this Court.

239.   When the Plaintiff indicated he would like to have a lawyer review the proposed agreement, Expeditors immediately withdrew the proposed agreement.

240.   The CEO's confidential communication and subsequent policy shifts regarding Expeditors no lay-off policy effectively dismantled critical safeguards within the company's disciplinary and termination procedures, creating an environment ripe for discriminatory practices.

241.   The emphasis on rapid staff reduction, combined with directives that placed undue pressure on managers to identify and dismiss 'underperforming' employees, incentivized the elimination of positions without regard for due process or anti-discrimination laws.

242.   Expeditors has withheld demographic data regarding the 1,600 to 2,000 employees who departed the company in 2023 under murky circumstances, obscuring any analysis of the separations in terms of gender or racial impact. The transparency of

such information is crucial; its absence raises concerns about whether the dismissals were tainted by discriminatory practices, especially in light of the company's apparent indifference to due process and anti-discrimination norms.

243.   While the CEO's clandestine workforce reduction program was being carried out, Expeditors resisted reporting to shareholders on the effectiveness of the company's diversity, equity, and inclusion efforts.

244.   In 2023, according to Schedule 14A filed with the Unites States Securities and Exchange Commission on 21 March 2023, shareholders proposed that Expeditors report to shareholders on the effectiveness of the company's diversity, equity, and inclusion ("**DEI**") efforts.

245.   Specifically, the shareholders requested that a report be done at reasonable expense, exclude proprietary information, and provide transparency on outcomes, using quantitative metrics for hiring, retention, and promotion of employees, including data by gender, race, and ethnicity.

246.    In its statement of opposition to the resolution, the Board stated that: "... a 'DEI Initiatives' report would not reflect nor do justice to how our business operates: it alone would not be illuminating; it would require resources to develop; and it would not advance an understanding of risk or opportunity."

247.    Expeditors significantly lags its peers in the disclosure and transparency it provides to investors. Expeditors has never publicly released an EEO-1 report, a data set that 94% of S&P 100 companies and 57% of S&P 500 companies have released or committed to release.

248.    The release of workforce composition data is akin to a balance sheet, detailing diversity at a single point in time.

249.    Expeditors' reluctance to disclose employee demographic data, including gender, race, and ethnicity, obfuscates any disparities that may exist, making it impossible for stakeholders and the public to ascertain the fairness and impartiality of the CEO's clandestine workforce

reduction strategy, thereby eclipsing the transparency that acts as the most potent antidote to discrimination: the illuminating force of sunshine.

250.    The timing of Expeditors' resistance to disclosing DEI data, coming shortly after the initiation of the CEO's clandestine workforce reduction program, indicates that the company's non-disclosure is deliberate, strategic, and designed to mask discriminatory practices.

251.    The reluctance of Expeditors to disclose employee demographic data, particularly in the wake of the CEO's clandestine workforce reduction program, casts a shadow over the company's commitment to DEI.

252.    Such deliberate obfuscation feeds into the Plaintiff's concerns that the clandestine and forced reductions resulted in the systematic disenfranchisement of specific demographics within the workforce that the program's secrecy was intended to conceal.

253.   The adoption of the CEO's clandestine policy precipitated the abrupt dismissals of two minority American employees at the Hong Kong office—one African-American, who was the only individual employed by Expeditors HK of African descent, and one Asian-American.

254.   These terminations, which occurred in close succession to the dissemination of the CEO's email, indicate that the policy was being implemented in a discriminatory manner by both Expeditors and its wholly owned and controlled Hong Kong subsidiary, Expeditors HK.

255.   Taken together, these facts indicate that the secret program and lack of oversight/transparency enabled discrimination and disproportionate firing of minority employees.

256.   Additionally, the CEO's policy was applied disproportionately to Americans in the Hong Kong office, allowing Expeditors HK to safeguard the positions of local Hong Kong staff at the expense of American expatriates.

## Post Termination Investigation

257.    After his termination, the Plaintiff retained
        solicitors, who are now associated with the Lee Law
        Firm, in Hong Kong to investigate the matter.

258.    On 5 January 2024 at approximately 11:30 am, two
        of the solicitors the Plaintiff retained went to
        the Rosewood Hotel to enquire about the
        availability of CCTV footage from the night in
        question.

259.    Upon inquiry, the hotel manager, identifying
        himself as Max, consulted with the security team
        and relayed to the inquiring solicitors that the
        video footage from the evening in question had been
        purged as per the hotel's data retention policy,
        which is done in the absence of incident reports
        or specific preservation requests within a set time
        frame.

260.    Additionally, the solicitors for the Defendants,
        by letter to the Plaintiff's solicitors dated 29
        January 2024, stated that they spoke with a manager
        at the venue as well and were informed that the
        CCTV was deleted.

261.    By email dated 30 January 2024 to the Plaintiff's
        solicitors, Mr. Louis Ho, Director of Rooms &
        Planning at Carlyle & Co. at Rosewood Hotel, in
        response to a request for the footage made under
        the Personal Data (Privacy) Ordinance (Cap. 486)
        made by the Plaintiff indicated the CCTV footage
        had been deleted and overwritten.

262.    The legal team representing the Plaintiff has also
        persistently reached out to the solicitors for the
        Defendants, requesting a comprehensive explanation
        for the Plaintiff's abrupt dismissal. This request
        is grounded in the legal framework of Hong Kong,
        which prohibits summary dismissal of an employee
        for misconduct that occurred before the inception
        of the employment contract.

263.    In repeatedly reaching out to the Defendants'
        solicitors, the Plaintiff's legal representatives
        sought clarity on both the factual circumstances
        and legal rationale behind the termination
        decision.

264.    In response to these inquiries, the Defendants'
        solicitors have not provided the sought-after
        justification for the Plaintiff's termination.
        Instead, their correspondence has taken on an
        extremely confrontational tone, with the
        Defendants' legal team issuing vague threats of
        legal action against the Plaintiff should he choose
        to pursue his claim and branding him a sex harasser.
        Such communications have neither addressed the
        Plaintiff's requests for information, nor have they
        contributed to a resolution of the dispute.

265.    In an effort to escalate the matter to internal
        corporate oversight, the Plaintiff's solicitors
        contacted Mr. Kevin Osborn, the Vice President,
        Associate General Counsel, and Chief Ethics &
        Compliance Officer at Expeditors, via email on 17
        January 2024.

266.    The purpose of this communication was to request
        an internal investigation into the procedures
        surrounding the disciplinary actions involving Ms.
        Ho and the Plaintiff. Notwithstanding the gravity
        of the situation, there has been no acknowledgment
        or response from Mr. Osborn up to the point of the
        Complaint's filing which is disconcerting.

267.    By way of email dated 25 January 2024 to Mr. Jeffrey
        Dickerman, General Counsel for Expeditors, the
        Plaintiff's solicitors requested that he provide
        the correspondence address to the Board of
        Directors so that they could bring the actions of
        its CEO to their attention. Mr. Dickerman did not
        reply to the Plaintiff's solicitors.

268.    The Plaintiff reasonably believes that the Board
        of Directors of Expeditors has not been apprised
        of the CEO's actions, which he asserts are ongoing.

269.    Should the Plaintiff be wrong in this regard and
        the Board of Directors of a Fortune 500 company,
        with fiduciary duties to uphold corporate
        governance and ethical standards, knowingly
        sanctioned a clandestine strategy to dismiss up to
        2000 employees under the false pretences of
        performance issues, such conduct would represent a
        grave dereliction of the Board's oversight
        responsibilities and a flagrant violation of the
        trust of its stakeholders and employees.

270.   The Plaintiff, a dedicated employee of 25 years with an untarnished record and commendable service history, has been left in a complete state of shock by the actions of Expeditors and Expeditors HK and their steadfast refusal to disclose a single piece of evidence they relied upon to justify his summary dismissal.

271.   It is beyond implausible that the Plaintiff, in the presence of senior management and within a well-lit, crowded room, would abruptly and without precedent engage in the act of grabbing and repeatedly kissing the shoulder of a fellow employee with whom he had no prior acquaintance or relationship after an impeccable 25 year record with the company.

272.   Moreover, the Defendants have managed the situation with a troubling lack of clarity, characterized by their steadfast refusal to unveil the specific evidence underpinning their decision to terminate the Plaintiff. This persistent opacity and their aversion to engaging in constructive dialogue exacerbate the dubious circumstances surrounding the Plaintiff's termination.

273.    At this late stage, the Plaintiff is still in the
dark about whether there was even any direct
dialogue between Ms. Cheung and Ms. Lau about the
incident in question.

274.    In a final attempt to elucidate the factual and
legal justifications for the Plaintiff's
termination, the Plaintiff's legal representatives
dispatched a comprehensive inquiry to the
Defendants' counsel. Detailed within a
correspondence dated 29 January 2024, this
communication reiterated the request for a
transparent disclosure of the grounds upon which
the Plaintiff's dismissal was predicated. A copy
of this letter has been duly appended to this
document as **Exhibit 3.**

275.    In their correspondence dated February 5, 2024
replying to the letter of 29 January 2024, the
Defendants' solicitors excerpted a sentence from a
larger paragraph in a prior communication from
Plaintiff's counsel and presented it out of
context. However, the full paragraph described a
hypothetical scenario where Plaintiff assumed Ms.
Lau's allegations were partially true solely for
the sake of argument, which he expressly denies.

93

276.    By removing the sentence from its surrounding
        context, the Defendants' solicitors materially
        mischaracterized the intended meaning and
        implication of Plaintiff's counsel's statement.
        This selective excerpting presented a misleading
        portrayal of Plaintiff's position in contrast to
        the complete and accurate substance as originally
        conveyed.

277.    The Defendants' solicitors then inaccurately
        asserted that the Plaintiff's solicitors had
        transferred blame to the Defendants, based on this
        out-of-context excerpt. Such misrepresentation
        fails to convey the full and accurate substance of
        the Plaintiff's position as originally
        communicated.

278.    While the Defendants' solicitors touted the
        thoroughness of their clients' internal
        investigation—including witness interviews and a
        disciplinary hearing—they once again conspicuously
        failed to provide **any** tangible evidence to
        substantiate the rationale for terminating the
        Plaintiff or address the numerous deficiencies in

the manner in which they conducted the disciplinary hearing.

279.    Furthermore, as with Ms. Cheung previously, the Defendants' solicitors characterized Plaintiff's accurate recollection of Ms. Lau's own statements about not being in compliance with the dress code policy as an attempt to improperly shift blame to her. However, the Plaintiff maintains he was simply providing factual context, not accusing Ms. Lau, by recounting her own assertions regarding her attire that evening in response to the investigator's questioning.

280.    The Defendants' solicitors also wholly disregarded the legal impossibility, under Hong Kong law, of justifying a summary dismissal on the basis of actions that occurred prior to the execution of the employment contract and were known to the employer at the time of contract signing.

281.    Put in simple terms, it is trite law in both Hong Kong and Massachusetts that there cannot be a breach of a contract for conduct that predated the date of contract formation.

282.   Finally, the Defendants' solicitors concluded by
       erroneously stating the Plaintiff has "**no chance
       of success**" and that the matter has "**no relevancy
       with the United States at all.**" However, this
       position fails to acknowledge:

   a) Expeditors is incorporated and headquartered in
      the United States;

   b) Many of the alleged discriminatory acts
      occurred while Plaintiff was employed by the US
      entity;

   c) Expeditors HK functions as an extension and
      alter ego of the US parent company; and

   d) The CEO devised and directed a clandestine
      scheme to covertly terminate thousands of
      employees, which was concealed from US
      shareholders in potential violation of
      securities laws.

283.   The Defendants' attempt to portray this matter as
       a simple employment dispute devoid of United States
       interests demonstrates their unwillingness to
       properly address discrimination, contract

breaches, and securities law concerns at the heart of this case. A copy of the letter dated 5 February 2024 from the Defendants' solicitors has been duly appended to this document as **Exhibit 4**.

284.    The Plaintiff's solicitors also, by letter dated 24 January 2024 to the Defendants' solicitors, requested that they respond to the Plaintiff's concerns regarding whether in implementing its clandestine layoff and forced resignation program Expeditors had violated U.S. securities laws, including rule 10-b5, by failing to disclose a planned 10% reduction in its workforce to shareholders. A copy of this letter has been duly appended to this document as **Exhibit 5**.

285.    The Defendants did not respond to the allegations contained within the letter attached as Exhibit 5.

286.    Based on the failure of the Defendants to provide any facts or basis in law for the Plaintiff's termination despite repeated requests, the only logical inference to be drawn is that the Plaintiff's termination was driven by ulterior, discriminatory motives rather than legitimate workplace conduct issues.

287.    The Plaintiff further asserts that the hostile and threatening posture taken by the Defendants' solicitors and refusal to comment on the covert lay-off and forced resignation program implemented by Expeditors' CEO further supports the inference that the Plaintiff's termination was the result of improper and discriminatory motives.

## Equal Opportunity Commission

288.    On 24 January 2024, the Plaintiff filed a charge with the United States Equal Employment Opportunity Commission ("**EEOC**") based in Boston, Massachusetts.

289.    The charge asserted that Expeditors engaged in discriminatory practices against the Plaintiff on the grounds of sex and national origin, which constitutes a direct violation of Title VII of the Civil Rights Act of 1964. This action was initiated to address the alleged inequities and seek recourse for the Plaintiff's grievances under federal anti-discrimination laws.

290.    The EEOC issued the Plaintiff a Notice of Right to Sue, which the Plaintiff received on 20 February 2024. A copy of the Notice of Right to Sue and Charge filed by the Plaintiff have been duly appended to this document as **Exhibit 6.**

291.    This Complaint is being filed within 90 days of the Plaintiff's receipt of the EEOC Notice of Right to Sue.

292.    As the Boston office of the EEOC handled the investigation, employment records relevant to this matter are maintained within this jurisdiction.

**FIRST CAUSE OF ACTION**
**(Violation of Title VII of the Civil Rights Act of 1964**
**(42 U.S.C. §§ 2000e to 2000e-17 gender and national**
**origin)**
**(Expeditors and Expeditors HK)**

293.    The Plaintiff hereby realleges and incorporates by reference all preceding paragraphs of this Complaint.

294.    The Plaintiff, David Keane, was terminated from his employment due to his sex and/or national origin, in violation of Title VII of the Civil Rights Act

of 1964.

295.    The termination of the Plaintiff was unlawful and
based on discriminatory practices, which explicitly
contravene the protections provided under Title VII
of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e
to 2000e-17), engaged in by the Defendants,
Expeditors and Expeditors HK.

296.    The Defendants' have also unlawfully discriminated
against the Plaintiff by subjecting him to
disparate treatment because of his sex.

297.    Similarly situated individuals outside the
Plaintiff's sex and national origin were treated
more favourably by the Defendants, including Ms.
Ho and the prior individual who falsely accused the
Plaintiff of sexual harassment, who were not
disciplined despite clear violations of the Code
of Business Conduct, and employees of Expeditors
HK, who were apparently protected from the CEO's
secret scheme to avoid layoffs under the guise of
performance based terminations and given
preferential treatment due to the political
tensions between Hong Kong and the United States,
indicating a clear pattern of discriminatory

practices based on sex and national origin.

298.   As a direct and proximate result of the Defendants'
       actions, the Plaintiff has suffered damages,
       including but not limited to lost wages, lost
       employment benefits, emotional distress, and other
       non-pecuniary losses.

## SECOND CAUSE OF ACTION
### (Breach of Oral Contract)
### (Expeditors)

299.   The Plaintiff hereby realleges and incorporates by
       reference all preceding paragraphs of this
       Complaint.

300.   The Plaintiff, David Keane, and Defendant,
       Expeditors, entered into an oral agreement as part
       of the negotiations regarding the Plaintiff's
       relocation to Hong Kong.

301.   In consideration of the Plaintiff's agreement to
       relocate to Hong Kong, Expeditors agreed to the
       Plaintiff's relocation on a temporary basis and
       assured the Plaintiff that upon the successful
       transition of the Lenovo account and the
       appointment of a suitable successor, the Plaintiff

would be reinstated to his original position in the Massachusetts office.

302.    Expeditors also agreed that the Plaintiff's employment status would remain with Expeditors and not be transferred to any other entity, underscoring the temporary nature of the Hong Kong assignment.

303.    The oral agreement was supplemented by the Employment Agreement and HK Employment Agreement.

304.    The Plaintiff's relocation to Hong Kong was contingent upon the explicit understanding that the move would be temporary in nature, and the Plaintiff's eventual return to his original position in the Massachusetts office was a fundamental component of the oral agreement.

305.    Defendant, Expeditors, by terminating the Plaintiff's employment in an unlawful way under Hong Kong law, have breached the oral contract and the implied covenant of good faith and fair dealing.

306.    Furthermore, Expeditors' conduct during the disciplinary hearings, which were tainted by unfairness and bias, directly violated the implied covenant of good faith and fair dealing. These hearings deprived the Plaintiff of a fair and impartial process, including but not limited to denying the Plaintiff the opportunity to present evidence and witnesses in his defence, failing to provide the Plaintiff with a full and fair opportunity to respond to the allegations, and failing to conduct the hearings in a manner consistent with basic principles of fairness and due process.

307.    The Plaintiff justifiably relied on the oral agreement and the subsequent Employment Agreement and HK Employment Agreement, and in doing so, made significant sacrifices in uprooting his life and career to fulfil his obligations under the agreed-upon terms. Expeditors' unilateral disregard for these terms, coupled with the unfair and biased disciplinary hearings, has caused the Plaintiff substantial harm and damages.

308.    The breach of the oral contract by Defendant
        Expeditors, combined with the violation of the
        implied covenant of good faith and fair dealing and
        the unfair disciplinary hearings, has resulted in
        significant financial and emotional distress for
        the Plaintiff, as well as a detrimental impact on
        his professional standing and future career
        opportunities.

309.    As a direct result of Defendant Expeditors' breach
        of the oral contract, the implied covenant of good
        faith and fair dealing, and the unfair disciplinary
        hearings, the Plaintiff has suffered and continues
        to suffer significant economic and non-economic
        damages, including but not limited to loss of
        income, loss of employment benefits, emotional
        distress, damage to reputation, and other
        consequential damages.

                    **Third Cause of Action**
                    **(Breach of Contract)**
                    **(Expeditors)**

310.    The Plaintiff hereby realleges and incorporates by
        reference all preceding paragraphs of this
        Complaint.

104

311.    The Plaintiff, David Keane, and the Defendant,
        Expeditors, entered into an Employment Agreement
        on 10 July 2018 in Massachusetts, which constitutes
        a binding and enforceable contract.

312.    The employment contract contained an implied
        covenant of good faith and fair dealing and/or an
        implied mutual covenant of trust and confidence
        between the employer and the employee, which
        requires that neither party will, without
        reasonable and proper cause, conduct themselves in
        a manner likely to destroy or seriously damage the
        relationship of confidence and trust between them.

313.    The Plaintiff fulfilled his obligations under the
        Employment Agreement, demonstrating his commitment
        and contributing to the company's success,
        particularly with the Lenovo account.

314.    The Plaintiff failed to use its best efforts during
        the term of the contract to find a suitable
        replacement to take over the Lenovo account.

315.    Expeditors, by switching the Plaintiff's employment
        to Expeditors HK, knowing that it intended to

terminate him for sexual harassment, and then summarily terminating the Plaintiff's employment without just cause or due process as provided under the Employment Agreement, have breached the terms of the Employment Agreement and the implied covenant of good faith and fair dealing and/or implied mutual covenant of trust and confidence.

316.   The disciplinary proceedings leading to the Plaintiff's termination were conducted in a manner that was fundamentally unfair, biased, and in violation of the Employment Agreement, the Code of Business Conduct and the implied mutual covenant of good faith and fair dealing and/or implied mutual covenant of trust and confidence inherent in the employment relationship.

317.   The summary dismissal of the Plaintiff was conducted in a manner inconsistent with the statutory protections afforded under the Employment Ordinance and the terms of the Employment Agreement, constituting a breach of contract and a violation of the implied covenant of good faith and fair dealing and/or implied mutual covenant of trust and confidence.

318.    As a direct consequence of Expeditors' breach of
        the Employment Agreement and the violation of the
        implied covenant of good faith and fair dealing
        and/or implied mutual covenant of trust and
        confidence, the Plaintiff has suffered loss and
        damages, including but not limited to loss of
        income, loss of employment benefits, emotional
        distress, damage to reputation, and other
        consequential damages.

                        **Fourth Cause of Action**
                        **(Breach of Contract)**
                        **(Expeditors HK)**

319.    The Plaintiff hereby realleges and incorporates by
        reference all preceding paragraphs of this
        Complaint.

320.    The Plaintiff, David Keane, and the Defendant,
        Expeditors HK, entered into the HK Employment
        Agreement on 25 September 2023, which constitutes
        a binding contract.

321.    The HK Employment Agreement contained specific
        terms and conditions of employment, which were
        mutually agreed upon by the Plaintiff and

Expeditors HK, and which governed the employment relationship between the parties.

322.    The HK Employment contract contract contained an implied covenant of good faith and fair dealing and/or of mutual trust and confidence between the employer and the employee, requiring that neither party will, without reasonable and proper cause, act in a manner likely to destroy or seriously damage the relationship of confidence and trust between them.

323.    The Plaintiff commenced his employment with Expeditors HK in reliance on the terms of the HK Employment Agreement and faithfully performed all duties and obligations required of him under the agreement.

324.    Expeditors HK, by failing to pay the Plaintiff commissions owed to him and summarily terminating the Plaintiff's employment without just cause or due process as provided under the HK Employment Agreement and Hong Kong law, have breached the terms of the HK Employment Agreement and the implied covenant of good faith and fair dealing and/or implied covenant of mutual trust and

confidence.

325.    The summary dismissal of the Plaintiff was conducted in a manner inconsistent with the statutory protections afforded under the Hong Kong Employment Ordinance and the terms of the HK Employment Agreement, constituting a breach of contract and a violation of the implied mutual covenant of trust and confidence.

326.    The disciplinary proceedings leading to the Plaintiff's termination were conducted in a manner that was fundamentally unfair, biased, and in violation of the HK Employment Agreement and the implied covenant of good faith and fair dealing and the implied mutual covenant of trust and confidence inherent in the employment relationship.

327.    As a direct consequence of Expeditors HK's breach of the HK Employment Agreement and the violation of the implied covenant of good faith and fair dealing and/or the implied mutual covenant of trust and confidence, the Plaintiff has suffered loss and damages, including but not limited to loss of income, loss of employment benefits, emotional distress, damage to reputation, and other

consequential damages.

**Fifth Cause of Action**
**(Interference with Prospective Business Relations)**
**(Expeditors and Expeditors HK)**

328.    The Plaintiff hereby realleges and incorporates by reference all preceding paragraphs of this Complaint.

329.    The Plaintiff had a longstanding and beneficial professional relationship and in particular with Mr. Davies, the Executive Director & Head of Global Logistics for Lenovo.

330.    Mr. Davies, who controlled an annual logistics budget exceeding one billion U.S. dollars, valued the Plaintiff's expertise and had a professional relationship with the Plaintiff that was expected to lead to future business endeavours, including the potential for contracts with any new company the Plaintiff might start post-employment with Expeditors.

331.    The Plaintiff had every expectation, based on the strength and history of his relationship with Mr. Davies and Lenovo, that he would be able to

cultivate this relationship into future business
opportunities that would result in significant
profit and career advancement after his tenure at
Expeditors.

332.  The Defendants, Expeditors and Expeditors HK, by
labelling the Plaintiff as a "sex harasser" through
their internal disciplinary proceedings and by
failing to halt the spread of pernicious rumours,
particularly those propagated by Ms. Edwina Ho,
have wilfully and maliciously interfered with the
Plaintiff's prospective business relations with Mr.
Davies and Lenovo and other potential customers
within the logistics industry.

333.  The actions of Expeditors and Expeditors HK have
forever tainted the Plaintiff's professional
reputation and have substantially diminished his
ability to engage in future business endeavours
with Mr. Davies, Lenovo, and others in the
industry.

334.  The false allegations and the manner in which
Defendants Expeditors and Expeditors HK conducted
their internal investigation were designed to harm
the Plaintiff's reputation, and they did not offer

the Plaintiff a fair opportunity to refute the accusations, thus exacerbating the harm to his standing in the business community.

335.   As a direct and proximate result of the Defendants' wrongful actions, the Plaintiff has suffered economic harm due to the loss of prospective business opportunities and relationships, which would have likely resulted in significant income, and, as a result, is entitled to make a claim for interference with prospective business relations.

336.   The Plaintiff has also suffered noneconomic damages, including but not limited to, emotional distress and damage to his reputation within the logistics and business communities, both in Hong Kong and globally.

## Sixth Cause of Action
### (Negligent Infliction of Emotional Distress)
### (Expeditors and Expeditors HK)

337.   The Plaintiff hereby realleges and incorporates by reference all preceding paragraphs of this Complaint.

338.   The Defendants, Expeditors and Expeditors HK, owed

112

the Plaintiff a duty to conduct any investigation and disciplinary proceedings against him in a non-negligent and lawful manner so as to avoid subjecting him to emotional distress.

339.    The actions of the Defendants in falsely accusing the Plaintiff of sexual harassment, failing to conduct a fair investigation, unlawfully summarily dismissing him and publicizing the false allegations without just cause were unreasonable and negligently inflicted emotional distress upon the Plaintiff.

340.    As a direct and proximate result of the Defendants' actions, the Plaintiff suffered severe emotional distress, including but not limited to anxiety, depression, loss of sleep and appetite, and other physical and emotional symptoms.

341.    The Defendants knew or reasonably should have known that their negligent actions would cause him to suffer severe emotional distress given the damaging nature of the allegations in his professional context.

342.    As a result of the Defendants' negligent infliction
        of emotional distress, the Plaintiff is entitled
        to compensatory damages, including damages for
        past, present and future emotional pain and
        suffering as well as economic losses.

**PRAYER FOR RELIEF**

   **WHEREFORE**, the Plaintiff, David Keane, respectfully
requests that this Court:

   A.   Grant a preliminary injunction enjoining the
        Defendants, their officers, agents, servants,
        employees, and all persons in active concert or
        participation with them from commencing,
        continuing, maintaining, instituting, or
        prosecuting any suit, action or other proceeding
        in any jurisdiction outside the United States,
        including Hong Kong, related to the subject matter
        of this action or having the effect of interfering
        with these proceedings pending resolution of this
        case;

   B.   Award back pay, including but not limited to,
        salary, wages, bonuses, and other compensation,
        plus interest, that the Plaintiff would have
        received but for the discrimination;

   C.   Award front pay, in lieu of reinstatement, if
        reinstatement is not feasible, including
        compensation for loss of future earnings and
        benefits, plus interest, due to the discriminatory
        acts;

   D.   Order the reinstatement of the Plaintiff to his
        former position, or a substantially equivalent
        position, at Expeditors International of
        Washington, Inc. and/or Expeditors Hong Kong
        Limited, with all appropriate seniority, benefits,

pension rights, and other terms and conditions of employment, if such reinstatement is found to be appropriate;

E.    Award compensatory damages for past and future non-economic losses, including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

F.    Award punitive damages against the Defendants for their malicious and reckless conduct that led to the violation of the Plaintiff's rights under Title VII of the Civil Rights Act of 1964;

G.    Grant a permanent injunction enjoining the Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them from engaging in employment practices which discriminate on the basis of sex or national origin, and from retaliating against the Plaintiff for filing this action;

H.    Order the Defendants to initiate and implement policies, practices, and programs that provide equal employment opportunities for all employees and applicants, and which eradicate the effects of their past and present unlawful employment practices;

I.    Order the Defendants to pay the Plaintiff's reasonable attorneys' fees and costs incurred in this action as provided by 42 U.S.C. § 2000e-5(k);

J.    For the breach of contract claims award damages consistent with the terms of the Employment Agreement and the HK Employment Agreement, including but not limited to, compensatory damages for lost wages and benefits, emotional distress, and damage to professional reputation, and special and exemplary damages;

K.    For the interference with prospective business relations under Hong Kong law, award damages to compensate for the economic harm, emotional distress, damage to professional reputation, and the loss of prospective business opportunities and relationships due to the Defendants' wrongful actions, as well as special and exemplary damages;

L.    Award the Plaintiff disgorgement and restitution of the profits wrongfully obtained and retained by

the Defendants as a result of their interference with the Plaintiff's prospective business relations;

M.   Award all other damages to which the Plaintiff is entitled to, along with pre-judgment and post-judgment interest and costs; and

N.   Grant such other and further legal and equitable relief as this Court deems just and proper to fully compensate the Plaintiff for his losses and to deter such conduct in the future.

**The Plaintiff demands a trial by jury on all issues.**

David Keane, Plaintiff
By his attorney,

_____
Adam Clermont (林汶輝), Esq.
6 Liberty Square
PMB 226
Boston, MA 02109
Tel: (413) 841-1270(Massachusetts)
Tel: +852 9086 3191(Hong Kong)
E-mail: aclermont@attorneyapc.com
BBO No.: 639769

Dated: 2/20/2024